The first case called for oral argument is Henry Marriage of Steve Boston and Diana Boston. Counsel, whenever you're ready, please proceed. Thank you. To please the court, Mr. Steiger, my name is Edmund Carthy. I'm counsel to the appellant, Diana Boston, who was the respondent in the original case. And those designations followed through for just for the purposes of keeping the parties clear. If you please the court, I'll just refer to him as Mr. and Mrs. or Diana and Steve. Sure. And and also have the pleasure of introducing Kyle Whiteside, who's with me today. Kyle is with my office and just learned that he passed pardon. Congratulations. November 10th. He just missed by about six weeks coming up here and providing this argument to you. So this case arises out of the construction of the divorce decree between the parties. We call the solution in and. The operative wording is in question, eventually involve a swing of $200,000 or ninety nine thousand nine hundred forty three dollars. And the the parties did own substantial properties and businesses. And one of the provisions of the decree of dissolution, which was negotiated and stipulated and signed by the party, was that Steve would take control of the one of the businesses of the party's own, which is called Asko. It was a corporation had a driver. And he would hold Diane, Diana, excuse me, harmless for the debt. They wouldn't sell the property. And upon the sale, upon the sale of property, Diana would get $250,000. And if the property could be sold for a net of more than $500,000, then they would split the amount of about $500,000. Now, Judge Chapman in the trial court, as we went through the hearing and the various aspects of the case, determined that despite this word. That that the. Which we argue, we look at the four corners of the document, the agreement between the parties, this is how it's true. Judge Chapman took it and said, no, this is more this more looks more like an attempt to have an even split versus a negotiated split. And he he he relied on a couple of things there, all of which we address in the the brief. First, he he he took two or three words of the of the wording of the document. And we feel just misconstrued and said that because. The parties use the wording that Diana would be paid $250,000 from the proceeds. That meant that if the proceeds weren't sufficient, she wasn't going to get as much as $250,000. Then also, he took wording. We had filed an earlier petition asking for an injunction to stop the sale because Steve, who had taken control of the business, was attempting to sell it for a lot less. And this was. We looked at this property. Yes. Although she was to be paid $250,000, this was really security toward that, at least toward some of the money. And so we were concerned that he was going to sell it for cheap. And we filed a petition asking him, asking the court to stop that. And in that petition, phraseology was used involving the net proceeds. And the judge Chapman considered that wording in that petition, which was verified to be an admission of fact. It's our position, which we agreed. And so that it was that that wasn't an admission of fact. That was just a argument, a part of our argument in the law. And it can't be construed against us as an admission of fact, because we were talking about how the contract would be construed. That's an agreement. Then finally, Judge Chapman relied on a stipulation that occurred during the proceedings. What happens, we had a hearing or two, I think we had maybe two or three hearings on this case back in 06. I don't remember what year it was, but anyway, we had the hearings. And then we determined that, yes, it was time to sell it. And we entered into a stipulation that set forth items, specified the kinds of charges that could be taken out of the proceeds. And then it said that the net proceeds would be paid to my client, Diana. The purpose of that stipulation was to specify, you know, to give directions as to how the title company was to handle this transaction. And did not in any way contain any wording that Diana was settling for less than $250,000. Or was agreeing to Steve's position on anything. As a matter of fact, the stipulation stated that we were going to come back to this case at a later time, which we did. So Judge Chapman determined that Diana was owed not $250,000, but the net proceeds of that sale. And as the court looks at the stipulated agreed dissolution of marriage and reads all of those points, you'll find that really there's five points about this property, this Escobasco. And this is where we think Judge Chapman missed the ball with construing this agreement. First, it said that Steve was going to agree to take responsibility for all the debt of Escobasco. Then it said that the property within a certain period of time, I think it was a year, would be listed for sale. And that both parties would assist in the listing. Then it said, as a third paragraph, as I recall, I think there are five separate paragraphs, that as a further settlement, Diana was to receive $250,000 from the proceeds. The testimony was that the parties thought it was worth about $800,000. Eventually they sold it for $450,000 or something like that. They were way off of what they thought the property, or at least eventually when it sold, didn't sell for nearly what they thought it was going to. Then there was a clause that said, the fourth clause concerning this property, was that the petitioner, that's Steve, shall arrange for that sum of $250,000 to be paid directly to the respondent, who's Diana, at the closing, as a further allocation and distribution of marital property to her. So, despite the fact that the money was, the intention of the parties was that yes, the money, at least some of this money was to come from the sale of Escobasco property, Diana was supposed to be paid $250,000 when the property sold. Steve got control of the property, he could run the business as he wanted to, and it didn't work out for Steve. But Diana was still owed the $250,000. Then the fifth clause, I think is really telling, is that if the property sold for more than $500,000 net, if the net sales price, or net proceeds, I think they actually use, no, net sales price is what they use, if the net sales price of the property is more than $500,000, which would be obviously double Diana's $250,000. So, Diana would get $250,000 and Steve would get $250,000. If it would be sold for that net sales price or greater, then the parties would split whatever was above that half a million dollars. What is significant to me about that clause, and I think that the court admits, is that he, Judge Chapman, jumped on this wording about out of the proceeds, as I indicated in about the third paragraph, out of the proceeds comes $250,000. And he thought that means net. If it's out of the proceeds, it's got to be net. But it wasn't, and that's not what the people agreed to. All of these clauses indicate that the parties agreed that Diana would get $250,000 no matter what the property sold for. The significance of this last clause that I mentioned to you about the net over $500,000, it showed that they know, they knew at the time that they entered into this agreement what net meant, and that they had a clause in there about net proceeds. They did not use net proceeds when they were talking about the payment of $250,000. They did use net proceeds when they were talking about the possibility of the property not only paying Diana $250,000 and then Steve $250,000, but even more than that. So they knew the possibility of netting something out, and they didn't think that was significant, and that was not the agreement about the $250,000 to be paid to Diana. So on top of that, in the evidence, Steve wrote a letter to Diana where he acknowledged that their agreement was that Diana was to receive $250,000. However, he said that it wasn't going to generate enough money to pay her $250,000 and for him to get anything. So he just wasn't going to do it. He wasn't going to agree to continue that kind of settlement. And the court found that somehow that the parties' agreement intentions all along were to equalize. And we've got a couple pages of calculations for the court in the brief where we show that there's no way it could have equalized. Even if, even with Diana getting less, even with Diana getting net proceeds as Steve intended, it would never have met the net proceeds or the equalization. Thank you, counsel. Counsel? Justice Goldberg, Mr. McCarthy, please, the court. This is one that, unfortunately, the trial courts and this court gets frequently. These parties reached an agreement. They made their own deal, and then there's a disagreement, and it falls to Judge Chapman to figure out what was the deal they agreed to. He was interpreting the agreement. The operative language that's repeated in the brief that Mr. McCarthy went over was, when the Route 66 driving range is sold, the petitioner, Diana, shall, or no, the petitioner, Steve, shall pay to the respondent, Diana, the sum of $250,000 from the proceeds. Judge Chapman spent a lot of time working on this. We had, if you look through the procedural history, we had a number of hearings. He spent a lot of time on it, and he spent a lot of time in his order. This was not a two-line toss-out kind of a ruling. He identified four factors that he thought were significant in coming to the conclusion that he did. The first one was the specific language. The agreement was that she was to be paid $250,000 from the proceeds of the sale. The second thing was, as Ed mentioned, there was one contract for sale. They filed an injunction. It fell through, and then there was a second contract for sale, unfortunately, $50,000 less, that actually went through. Shortly prior to that going through, the parties got together and signed a separate stipulation as to how the sale was going to be handled. So you've got the original agreement and the divorce decree prior, and then on the eve of the sale, they enter into a written stipulation that's on, I think, page 43 of Ed's brief that says, The deduction to reach net proceeds shall include items specified in the real estate contract, a real estate commission of 6%, and only the mortgage on the Route 66 driving range, building, and land, and the balance of the loan from the inventory and equipment as described in the judgment of dissolution of marriage, and the net proceeds shall be payable to Diane. So, again, if you have proceeds in the judgment and you have the parties agreeing that it's going to be net proceeds on the eve of sale, that was the second factor that Judge Chapman felt significant. The third factor was he did find that overall the agreement that the parties had reached in their judgment was that there would be an even split of assets. And Ed recited for you the provisions, if the Route 66 driving range sold for more than $500,000, Diana would get $250,000, Steve would get $250,000, and they'd split the rest. But what Judge Chapman pointed out is they had a number of other pieces of property. They had a house down at the lake, the Ozarks. They had a house in Edwardsville. And on each one of those, there was an agreed price. Steve got the house at the lake and Diana got the house in Edwardsville. But if the house is sold within a year after the judgment for more than what they had said, then they would split those proceeds equally, which the judge found to be consistent with the overall agreement that they had reached that they're dividing things equally. The final thing that Judge Chapman thought was extremely significant and had mentioned at passing is early in this case, there was a contract to sell the driving range. And Diana filed an injunction. And successfully, while the injunction actually was pending, the contract was withdrawn or the deadline was missed, but it effectively canceled that sale. And the allegation that she had in her verified pleading was by the terms of the judgment, the original divorce judgment, the plaintiff here in Diana, Boston, is to receive the first $250,000 of the net proceeds. There are two things. One, again, you have the language, but Judge Chapman said, wait a minute. If she believes she's guaranteed $250,000, what does she care what it sells for? Whatever it sells for, she's going to get her $250,000. So he felt that that was a clear indication of what Diana understood the agreement to be, that being that she was going to get $250,000 from the proceeds, and if the proceeds weren't there, she was going to get what there was. Because in her testimony, and we cited it in the brief, Diana was asked, do you state that there's a guarantee anywhere in the judgment that you're guaranteeing to receive $250,000? She testified, honestly, no, there's not. And I think her action in trying to stop the sale shows that she well knew that. If it was guaranteed, why would she care? We have a couple of issues on our cross-appeal, and I guess I should address, because Mr. McCarthy addressed whether our appeal is timely. This was one of those situations where when the order finally came down, it was my opinion that Diana would appeal the judgment. We also had some issues with it. We waited until the 29th day. Nothing had been filed, so we filed our notice of appeal on the $30,000 offsetting award to Diana and the award of attorney's fees. Later that afternoon, they filed a motion to reconsider. The motion to reconsider was heard, and as I read Rule 302A2, it is if I timely file a notice of appeal, and then there's a post-judgment motion filed. When that post-judgment motion is determined, then my notice is deemed to be timely filed and effective at that time. So the two issues we had addressed are, first of all, that at the end, in literally a one-sentence award, at closing, Steve was paid $30,000 to pay off the equipment loan at the driving range. And Judge Chapman decided that he should have to repay that to Diana. I wasn't really clear on the reasoning of that, but again, as I just read through the language from the stipulation, on the eve of making this deal to sell the driving range, they included in the stipulation of how they're going to divide the proceeds that they'd pay off the first mortgage that was on the building and the land, and they would pay off the balance of the loan from the inventory and equipment as described in the judgment of dissolution of marriage. And that was on page 7 of their judgment. It references the outstanding loans, the Route 66 driving range inventory and equipment loan, loan outstanding $30,824. So in the face of the stipulation that these two parties, with the advice of counsel, signed off on less than a week before the closing, it was very clear that Steve was to receive that at closing, did receive that at closing, and I think it was an abuse of discretion for the judge to then say, after the fact, now you have to pay that back. The other issue that we have with Judge Chapman's order, which we believe to be an abuse of discretion, is the award of $5,000 in attorney's fees. The basis of the award of attorney's fees was that Steve had been found in contempt. The difficulty with that is if you read through Judge Chapman's order, starting on page 2, there was no evidence on the issues of contempt. There was no evidence that the husband attempted to make it appear that the operating value of the corporation was less. There was no showing that the husband manipulated the affairs of the corporation. There was no showing that the husband contrived to justify a sale of the corporate assets. And then a couple pages later, the court concludes that there is no believable evidence that the husband purposely tried to lower the value of the property or purposely endeavored to cause it to run at a loss. Therefore, the contempt petition, to the extent it's based on those allegations, is denied. And if you read through the bulk of it, on every single issue that Diana raised as contempt, Judge Chapman found no contempt. The one thing he found that Steve had not done is, while this was pending, he didn't make some payments on COBRA health insurance. But he addressed that by awarding her the – they have a timeshare. Steve hadn't paid the COBRA and hadn't made the maintenance payments on the timeshare. So Judge Chapman said, okay, I'm going to award Diana the entire timeshare, which he found in his order to be an equal offsetting value. So I think in the face of – had he found Steve in contempt, contempt, contempt, I would not be arguing the attorney's case. I know how the – by the way, works. But I think in this case, when he specifically finds Steve not in contempt, it's an abuse of discretion to award the fees. Thank you. Thank you, counsel. Counsel? Thank you. A couple things first. Once again, concerning the wording of the – or the agreement of the parties. If the agreement must have been that Diana receives $250,000 above and beyond whatever the property – or not. If part of the proceeds of the property reset, $250,000, good. If Steve is allowed, as the court did, if Steve is allowed to take off the balance of the mortgage obligation, then part of his agreement, that is that he was going to hold her harmless, becomes, you know, violated or irrelevant or misconstrued or whatever terminology you want to use. He was specifically to protect her from the death of Esbosco. As it worked out, the judge allowed him to deduct that. Okay. So I don't think that that position is warranted in support of the judge's decision. The notice of appeal that was filed by Steve was specifically dismissed by order of this court. If it had not been dismissed, yes, then it would be open. But I think the record will show that that notice of appeal was dismissed and that a subsequent action to try to bring that back is not warranted without a second notice of appeal coming in later. Therefore, the $30,000 awarded, additional $30,000 awarded by the judge, that the record is clear about how that occurred. Counsel provided that number to the title company and apparently that he received from his client. But when a hearing was held, the judge was satisfied that Steve or that that was not a valid bill of Esbosco that Steve was allowed to deduct even in his erroneous rationale. So that $30,000 was added back in. The attorney sees we asked for, I think, $5,000 or something like that was awarded. We asked for about $20,000. That was certified with an affidavit and there was testimony about the attorney's fees. Some of the attorney's fees were duplicated in the parallel actions about the injunctions that you've heard a little bit about.  There was a specific finding of contempt about Steve not paying the COBRA and not paying his share of the timeshare. And otherwise, that's all I have as far as response. Thank you. Thank you, Counsel. Thank you. We appreciate the briefs and arguments of counsel. We'll take this case under advisement.